UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

Michael Barrett, IV, et al.,        )
                                    )
        Plaintiffs,                 )
                                    )
v.                                  )   2:11-cv-04242-NKL
                                    )
Donald M. Claycomb, et al.,         )
                                    )
        Defendants.                 )

**PLAINTIFFS' REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs challenge Linn State's attempt to institute a mandatory, suspicionless drug-testing policy to which all students must submit, under threat of expulsion, irrespective of their area of academic concentration or the nature of the classes in which they are currently enrolled. The alleged administrative procedures Defendants claim will enable students to avoid testing are vague and, more importantly, require students to assert and then prove their innocence, even in the absence of any indication that they are engaged in the use of illegal drugs. To the extent that the College's goal is to keep students and faculty safe from bodily harm, the policy at issue here is overbroad and not narrowly tailored to meet the stated need.

Defendants' contention that the drug testing program serves an "educational purpose" is also insufficient to overcome students' Fourth Amendment right to privacy. Defendants' desire to educate students about the drug-screening requirements that are imposed on certain industries does not constitute a "special need" sufficient to justify violating students' Fourth Amendment rights, particularly where, as here, less-intrusive means could be used to communicate the same message. As such, this rationale too falls short of the kind of compelling government interest that might justify the Fourth Amendment violations suffered by the Linn State students in this

1

case.

I. **Plaintiffs are Likely to Succeed on the Merits**

A. **The Court Should Apply the Fair Chance of Prevailing Standard**

In considering the first prong of the preliminary injunction inquiry, the Court must determine whether Plaintiffs have a "fair chance of prevailing" on the merits of their claims since the challenged provision is not a state statute. Indeed, nothing about the process by which the College's drug-testing policy was adopted resembles the procedures required prior to the enactment of a statute. As the Eighth Circuit has held, where a state policy or regulation is being challenged, the "fair chance of prevailing" standard is employed, except where the "regulations [were] developed through presumptively reasoned democratic processes…." *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 732 (citing *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)). The drug-testing policy implemented by Defendants was not the product of a democratic legislative process.[1] The absence of any kind of notice or comment period, including for students, further demonstrates that the "fair chance of prevailing" standard is the appropriate one under the circumstances.

B. **Defendants Have Not Demonstrated a Special Need Justifying the College's Suspicionless Drug-Testing Program**

Mandatory, suspicionless drug testing is prohibited under the Fourth Amendment to the United States Constitution unless the government can demonstrate a "special need" justifying the

---

[1] Notwithstanding Defendants' claims that the ACLU and other community groups were invited into the process, it was the ACLU, among others, who contacted school officials upon learning of the policy just prior to its implementation. On August 17, 2011, in response to the ACLU's demand letter, Defendants volunteered to provide the ACLU with a draft of their proposed procedures and purported to welcome input. Despite follow up requests from the ACLU, no draft was provided until just prior to Labor Day weekend—after business hours on the evening of Thursday, September 1, 2011. A cover letter indicated that the attached policy and procedures "will be issued by the College President on Tuesday." As promised, they were adopted on Tuesday, September 6, 2011, and students were removed from classrooms in groups to provide urine specimens starting the next day.

2

invasion of privacy. *See Chandler v. Miller*, 520 U.S. 305, 313-319 (1997). Here, the College has failed to identify a special need justifying its blanket drug-testing policy, which requires mandatory testing of "all first-year degree- or certificate-seeking students at the College, as well as all degree- or certificate-seeking students returning to the College after one or more semesters of non-enrollment at the College's main campus or any other Linn State Technical College location," without regard for in which of the College's 35 academic programs students are enrolled.[2] Defendants' rationales for their policy fall far short of any of the kinds of special needs recognized by the courts.

"[T]he proffered special need for drug testing must be substantial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." *Chandler*, 520 U.S. at 318. The relevant case law establishes that the "special needs" identified by Defendants are insufficient to overcome students' constitutional right to be free from a suspicionless government search. Defendants ignore the key differences between the circumstances surrounding their own drug-testing regime and those that have been sanctioned by the Supreme Court, and fail to explain how or why achievement of their goals necessitates testing of *all* students. Tellingly, Defendants do not dispute that not all students are required or choose to take classes involving dangerous instrumentalities, noting (without any supporting evidence) only that "*nearly* all the students will be voluntarily entering such heavily regulated industries," Defs. Br. at 7 (emphasis added), and claiming that a special need exists because of "the dangerous nature of the activities performed by *most* of its students." Defs. Br. at 9 (emphasis added). Despite the fact that only some Linn

---

[2] It is unclear why returning second-year students are exempt from testing. It does illustrate, however, the arbitrary nature of the College's policy since, presumably, Defendants' rationale for developing the program would apply with no less force to second-year students—perhaps even more so, given their more imminent entry into the workforce.

3

State students will be required to use dangerous instrumentalities as part of their academic training, Defendants assert that all "LSTC students already have a somewhat lowered expectation of privacy," Defs. Br. at 7, thereby justifying its mandatory drug testing of students in all academic programs upon admission.

Defendants concede that colleges are distinct from high schools, correctly pointing out that "the vast majority of [college] students are over the age of eighteen and are treated as adults." Defs. Br. at 4. More to the point, the Supreme Court cases involving drug testing of high school students are distinguishable from this case in at least three significant ways. First, it has been widely held that, while they do not check all of their constitutional rights at the schoolhouse door, children are subject to a diminished expectation of privacy when they are under the care and supervision of school officials. It was for that reason, in part, that the Court in *Vernonia School Dist. 47J v. Acton* permitted the testing policy at issue in that case. The Court recognized local governments' "responsibilities, under a public school system, as guardian and tutor of children entrusted to its care." 515 U.S. 646, 665 (1995); *see also Bd. of Ed. of Independent School Dist. No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 831 (2002) (noting that "[s]ecuring order in the school environment sometimes requires that students be subjected to greater controls than those appropriate for adults."). Linn State students are not children and should not be treated as such, particularly with respect to the rights secured by the Constitution.

The high school cases are distinguishable for a second reason. In both *Vernonia* and *Earls*, the drug-testing policies developed by the schools were narrowly tailored to apply only to those students who participated in voluntary extracurricular activities. *See Vernonia*, 515 U.S. at 662 (finding that "it must not be lost sight of that this program is directed more narrowly to drug use by school athletes, where the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high."); *Earls*, 536 U.S. at 837 (finding that "testing

4

students who participate in extracurricular activities is a reasonably effective means of addressing the School District's legitimate concerns in preventing, deterring, and detecting drug use."). Notwithstanding this diminished expectation of privacy in the public school context, in neither case did the school propose the kind of broad-based screening program, like the one at issue here, that would require *all* students to submit to testing.

Finally, the decisions in *Vernonia* and *Earls* were driven by the Court's concerns of rampant drug use among schoolchildren. In *Vernonia*, there was evidence of an epidemic of drug use at the particular school, and specifically among the school's athletes, that led to the development of the testing program. 515 U.S. at 662-663 (internal citation omitted) ("a large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion," which was "being fueled by alcohol and drug abuse as well as by the student's [sic] misperceptions about the drug culture"). Similarly, Defendants in *Earls* presented specific evidence of drug problems at their schools. 536 U.S. at 834. Defendants have conceded that the policy at issue in this case was *not* prompted by any particular problem of drug abuse at Linn State.

The workplace-related cases also do not help Defendants. The drug-testing scheme approved in *Skinner* arose because of proven concerns about drug use by railroad operators, including evidence that alcohol and drug use contributed to "at least 21 significant train accidents" over an 11-year span. 489 U.S. 602, 607 (1989). By contrast, there is no evidence of any such incidents having occurred in the College's 50-year history. Perhaps in recognition of this significant difference, Defendants instead focus on the fact that the employees in *Skinner* were part of an industry that is heavily regulated by the federal government in light of public safety concerns. But college students, even those who might one day join the ranks of such heavily regulated industries, are not employees. More importantly, even accepting Defendants'

5

imperfect analogy between employees of certain industries and college students in training to enter those industries, the fact remains that the College's plan to drug test all students, regardless of whether they will ever enter such industries, is overbroad and is not narrowly tailored to address any legitimate safety concerns.

In their discussion of the Court's decision in *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989), Defendants note that the drug-testing policy in that case was upheld even though "the government showed no heightened drug problem among the covered employees," and that, nevertheless, "the stakes were seen as high enough to allow the drug testing anyway." Defs. Br. at 6. But Defendants fail to mention that the testing program at issue there was narrowly tailored to the promotion of certain Treasury Department employees to positions requiring direct involvement in drug interdiction, the potential use of firearms, and the handling of classified material. It was only in this narrow circumstance that the government sought to subject applicants to mandatory drug testing. In sanctioning the program, the Court pointed out that it was limited only to employees in high risk positions whose work directly involved drug interdiction, or whose jobs would require them to carry a firearm or expose them to large amounts of illegal narcotics. *Von Raab*, 489 U.S. at 672. The Court's emphasis on the narrow nature of the testing program in *Von Raab* necessarily implies that had the government sought to subject *all* Treasury Department employees to mandatory drug testing, without regard to whether or not those employees would be engaged in drug interdiction work, such a program would have been rejected. In *Chandler*, the Court explained that "[h]ardly a decision opening broad vistas for suspicionless searches, *Von Raab* must be read in its unique context." 520 U.S. at 321. The fact that some Linn State students might one day handle dangerous instrumentalities as part of their academic training does not create a special need that justifies subjecting all students to suspicionless drug tests upon enrollment.

6

As Plaintiffs have explained, Linn State's policy is much more reminiscent of the drug testing policy rejected by *Chandler*. In both cases, the policy was developed without any evidence of drug use or abuse among those targeted for testing. And, as the Court has stated, "[a] demonstrated problem of drug abuse, while not in all cases necessary to the validity of a testing regime, would shore up an assertion of special need for a suspicionless general search program." *Id.* at 319. In addition, in neither *Chandler* nor here was the drug-testing policy narrowly tailored to address a compelling government need. *Chandler* determined that "[t]he need revealed, in short, is symbolic, not 'special,' as that term draws meaning from our case law." *Id.* at 322. Similarly, Defendants' efforts—through the implementation of a mandatory, suspicionless drug test—to live up to their mission of preparing students "for profitable employment and a life of learning," is symbolic, does not amount to a special need, and does not authorize school officials to violate the constitutional rights of the broad swath of students to whom the policy applies.

Because Defendants have not demonstrated a special need that could justify their attempt to carry out broad-based, mandatory, suspicionless drug testing of all new Linn State students, Plaintiffs have demonstrated a likelihood of prevailing on the merits in this case.

## II. Irreparable Harm

A violation of any constitutional right is, by its very nature, an irreparable harm. *Cohen v. Cohama County, Miss.,* 805 F.Supp. 398, 406 (N.D. Miss. 1992). *See also Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action,* 558 F.2d 861, 867 (8th Cir. 1977) (a showing that a law interferes with the exercise of constitutional rights supports a finding of irreparable harm); *Apple of His Eye, Inc. v. City of Saint Louis, Mo.,* No. 4:08-CV-00592 (HEA), 2008 WL 2568268, at *2 (E.D. Mo. June 24, 2008) ("There can be no sum, thing, or form of remuneration that might substitute, compensate, or repair a right in its entirety once

7

taken"). In addition, the Supreme Court has held in the drug-testing context that, "[t]here are few activities in our society more personal or private than the passing of urine." *Skinner*, 489 U.S. at 617.

Additionally, the Court has established that the collection of a urine sample and the subsequent analysis of that sample constitute separate Fourth Amendment violations. *Id.* at 616 (stating that "it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable. The ensuing chemical analysis of the sample to obtain physiological data is a further invasion of the tested employee's privacy interests."). Hence, the Named Plaintiffs are among approximately 540 students who have been required to submit urine specimens under the College's policy to this point, and have already been harmed. If the temporary restraining order lapses without issuance of a preliminary injunction, they face further violations of their constitutional rights when the College analyzes their compelled urine samples and reports the results of the analysis.

Defendants argue that students will not be irreparably harmed because the College has put in place administrative procedures that will allow "students who disagree with the screening or its results [to] petition the President of the College to either be exempted from the program entirely and/or to have any adverse action against them stayed until all appeals are complete." Defs. Br. at 9-10. As a threshold matter, these new provisions will not benefit students who have already been required to submit a urine sample. More importantly, an unconstitutional policy cannot be cured by simply forcing individuals to prove their innocence prior to having their rights violated, particularly in the absence of either individualized suspicion or a special need.[3] Furthermore, the alleged administrative procedures described by Defendants are vague. For

---

[3] A post-deprivation process, which is what at most Defendants offer Plaintiffs now, is even less sufficient.

8

instance, they include no guidance whatsoever as to the nature of the proceeding, burden of proof, or the factors weighed by the President of the College in considering individual requests to be exempted. Hence, the procedures do not satisfy basic requirements of due process. Moreover, the College made no effort to inform students of the existence of these procedures, nor how to initiate an administrative challenge, prior to taking them from the classroom in groups to procure urine specimens. Although the policy was adopted by the Board of Regents in June 2011, the official implementation procedures were not adopted until the day before urine specimens were collected, leaving students with no meaningful opportunity to learn about, or take advantage of, any process that might exist.

Even if the administrative procedures described by Defendants were adequate, such procedures would be of no help to students who refuse to submit to testing for reasons the College President, in his unfettered discretion, finds unacceptable. Indeed, as counsel for Defendants recently told *The New York Times*, students "would be administratively withdrawn if they refused to participate in the drug screening program." Timothy Williams, *At One College, a Fight Over Required Drug Tests*, N.Y. Times, Oct. 10, 2011, http://www.nytimes.com/2011/10/11/us/at-linn-state-technical-a-fight-over-required-drug-tests.html?ref=us.

For all these reasons, Plaintiffs would be irreparably harmed if the College is permitted to continue its mandatory, suspicionless drug-testing program.

### III. Balance of Harms

Defendants argue that students "can petition to be released from the screening program and have any action stayed until all appeals and litigation are over." Defs. Br. at 10. There is no evidence this is true. Even so, while Defendants claim that any action would be stayed upon filing of a petition, Defendants could still collect and analyze students' urine, in violation of the

9

Fourth Amendment, irrespective of the consequences that might flow from a positive test.

Defendants also suggest that any harm suffered by Plaintiffs as a result of the drug-testing policy will be outweighed by the College's interest in preventing the occurrence of a "serious or deadly accident." Defs. Br. at 11. There is no evidence any such accident has occurred or could reasonably be expected to occur. Neither is there any evidence to suggest that the drug-testing program at issue could be reasonably expected to prevent, or even reduce the likelihood of, any such accident. This is not a case like *Skinner*, for example, where the government presented hard evidence, not only of railway accidents, but of railway accidents caused, at least in part, by alcohol or drug use by railroad employees in specific positions. There is nothing like that here. The unsubstantiated speculation that the "statistical likelihood" of such an accident might increase over time is wholly independent of the drug-testing policy and does not constitute the kind of harm that could outweigh the very real constitutional harm that students will suffer in the absence of a preliminary injunction.

## IV.   Public Interest

Defendants start from the false premise that their invocation of safety concerns as a justification for their drug-testing policy creates a public interest in testing all Linn State students for the presence of drugs upon admission. While it is certainly desirable for the students, faculty, and staff at Linn State to avoid serious injuries, there is no evidence that the drug-testing policy furthers this goal. By contrast, "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008). The public interest thus supports an injunction that is necessary to prevent a government entity from violating the Constitution.

## V.   Conclusion

A preliminary injunction should issue in this case.

Respectfully submitted,


/s/ Anthony E. Rothert
ANTHONY E. ROTHERT, #44827MO
GRANT R. DOTY, #60788MO
AMERICAN CIVIL LIBERTIES UNION
      OF EASTERN MISSOURI
454 Whittier Street
St. Louis, Missouri 63108
(314) 652-3114
FAX: (314) 652-3112
tony@aclu-em.org
grant@aclu-em.org

JASON D. WILLIAMSON[4]
AMERICAN CIVIL LIBERTIES
      UNION FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
(212) 284-7340
FAX: (212) 549-2654
jwilliamson@aclu.org

ATTORNEYS FOR PLAINTIFF

---

[4] Admitted pro hac vice.

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was served by operation of the Court CM/ECF system upon counsel for each of the Defendants on October 12, 2011.

/s/ Anthony E. Rothert